**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **ADVANCED DRAINAGE SYSTEMS, INC.,**<br><br>　　　　　**Plaintiff,**<br><br>　　**v.**<br><br>**QUALITY CULVERT, INC.,** *et al.,*<br><br>　　　　　**Defendants.** | **Case No. 2:12-1121**<br>**Judge Peter C. Economus**<br>**MEMORANDUM OPINION AND ORDER** |

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (doc. 65), Defendants' Motion to Exclude The Expert Witness Testimony of Rebekah Smith (doc. 67), and Defendants' Motion *In Limine* to Exclude July 14, 2014 Affidavit of Mark Sturgeon (doc. 87). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Exclude The Expert Witness Testimony of Rebekah Smith (doc. 67), **DENIES** Defendants' Motion *In Limine* to Exclude July 14, 2014 Affidavit of Mark Sturgeon (doc. 87), and **DENIES** Defendants' Motion for Summary Judgment (doc. 65). The Court also **GRANTS** Plaintiff's motion for leave to file a surreply (doc. 104).

## I.　　Background

Plaintiff Advanced Drainage Systems, Inc. ("ADS") is a manufacturer of high density polyethylene ("HDPE") pipe products. Defendants Quality Culvert, Inc. ("Quality Culvert") and County Pipe, Inc. ("County Pipe," and, together with Quality Culvert, "Defendant Companies")) are former manufacturers of HDPE pipe products, and Defendant John H. Sonnentag is the sole shareholder of Defendant Companies.

This case arises from an Asset Purchase Agreement ("APA")[1] between the parties, dated March 9, 2012, pursuant to which ADS purchased Defendants' plastic pipe business. ADS filed this action for breach of contract seeking damages and injunctive relief against Defendant Companies and indemnity against all defendants. (Compl. ¶¶ 25–38.) Defendants filed counterclaims for breach of contract, indemnification, and declaratory judgment. (Ans. ¶¶ 15–25.) Following the agreed resolution of ADS' claim for injunctive relief (doc. 45), remaining are ADS' claims for damages and indemnity as well as Defendants' counterclaims.

ADS asserts that Defendants breached the APA's Covenant Not To Compete (the "Covenant"). The Covenant provides generally that Defendants shall not compete in the plastic pipe business in the Western Hemisphere for a period of five years following closing. (APA § 6(d).) However, the APA provided for an "Inventory Liquidation Period" consisting of 90 days after closing, ending on June 7, 2012, during which Defendants were permitted to sell and liquidate certain inventory "in a manner that does not materially interfere with or damage [ADS'] relationship with [Defendants'] customers going forward . . ." (APA § 6(g); Joint Stipulations of Undisputed Facts (hereinafter, "Stipulations") at ¶ 7.) The APA also required Defendants to "reasonably cooperate with [ADS] in its efforts to continue and maintain . . . business relationships . . . with customers, contractors and others." (APA § 6(a).) Defendants have not disputed the enforceability of the Covenant.

ADS alleges that Defendants violated the Covenant by "continu[ing] to issue quotes, accept purchase orders, take payment from customers, and store and deliver plastic pipe for nearly a year after the end of the Inventory Liquidation Period." (Doc. 79 at 6 (emphasis omitted).) While Defendants have disputed these allegations (docs. 11, 15), this dispute is not

---

[1] The APA is docketed as an exhibit to the Complaint (Dkt. 2-1).

relevant to their motion for summary judgment, which relies solely on arguments regarding what damages can be recovered under the APA and Ohio law.

ADS seeks damages for breach of contract against Defendant Companies as well as indemnity for "Adverse Consequences" against all defendants under APA § 8(b)(i). It presents evidence including the testimony of Rebekah Smith, who submitted an expert report on lost profits and business valuation, and the affidavit of Mark Sturgeon, ADS' Chief Financial Officer and Vice President. Defendants seek to exclude the above evidence (docs. 67, 87) and have moved for summary judgment (doc. 65). Because Defendants' motion for summary judgment relies in part on their motions to exclude evidence, the Court will first consider the motions to exclude evidence.

## II.    Motion to Exclude the Expert Witness Testimony of Rebekah Smith (Doc. 67)

ADS engaged Rebekah Smith, of GBQ Consulting LLC, to render an expert opinion regarding (1) ADS' lost profits, if any, resulting from Defendant Companies' sales outside of the Inventory Liquidation Period (referred to as "Violation Sales") and (2) ADS' lost profits and diminution of value, if any, resulting from Defendant Companies' alleged violations of the APA, including Violation Sales and damage to customer relationships. She submitted a report, summarized below, dated August 1, 2013. (Schmidt Declaration Ex. G at 3–4 (doc. 78-8, hereinafter referred to as the "Smith Report").)

Defendants seek to exclude Smith's testimony under Rules 702 and 703 of the Federal Rules of Evidence (doc. 67), arguing that (1) Smith has no expertise regarding the market for HDPE products (doc. 68 at 7), (2) her opinions regarding lost profits arising from alleged Violation Sales are not reliable (*id.* at 8–11), and (3) her opinions regarding "temporarily damaged" and "permanently damaged" customers lack foundation (*id.* at 11–18).

3

A.    **The Report**

As stated above, the Smith Report addresses (1) ADS' lost profits resulting from Violation Sales and (2) ADS' lost profits and diminution of value resulting from Defendant Companies' alleged violations of the APA, including Violation Sales and damage to customer relationships. (Smith Report 3–4.)

### 1.    *Lost Profits from Violation Sales*

In determining ADS' lost profits resulting from Violation Sales, Smith assumes that all alleged sales recorded after the Inventory Liquidation Period, including disputed sales, are "Violation Sales." She further assumes that, if Defendant Companies had not made each of the Violation Sales, ADS would have made a corresponding sale of comparable ADS products. Smith determined comparable ADS products by reviewing the product descriptions in Defendant Companies' sales reports and "cross referenc[ing] each of Defendants' products to an ADS comparable product." To determine what the ADS selling price would have been, Smith obtained "from the ADS accounting system" both (1) the price for each ADS product and (2) the related incremental gross margin. Using these numbers, she calculated that ADS lost revenue of $███████ and profits of ██████████. (Smith Report 8–10.)

### 2.    *Lost Profits and Diminution of Value*

Smith concluded that, as a result of Defendant Companies' alleged violations, ADS lost profits of $███████ for temporarily damaged customer relationships and $████████ for permanently damaged customer relationships.

She calculated these damages using the Before and After Method, which "compares the 'performance before the event or action causing lost profits' [the "Before Period"] to the 'performance after that event or action [the "After Period"].'" "The underlying theory is that, but for the defendant's action, the plaintiff would have experienced the same level of revenues and

4

profits after the event or action[] as before that event or action." She states that, "[i]n order to perform a damages calculation employing the Before and After Method, one must also 'consider other factors that could have affected the plaintiff's level of revenues and demonstrate how those factors have been taken into consideration," and effective use of the approach often includes a market analysis. (Smith Report 14–15.)

In this case, Smith "analyzed the customers and the HDPE market before and after the transaction date in order to identify any differences between the before and after period, either in general with respect to the industry, or specifically with respect to customers that would require adjustment to the before or after periods." (Smith Report 15.) Based on her analysis of the market, Smith determined that, "at a minimum, the before and after periods should be the same." (*Id.* at 16.) Based on her analysis of ADS' performance overall, by territory, and locally excluding sales to acquisition customers, she concluded that no overall market impact explained the decrease in ADS' sales to Defendant Companies' customers. (*Id.* at 17–18.)

Finally, Smith analyzed individual customers to determine if there were customer-specific differences between the Before and After Periods. She included customers (1) with revenues in excess of $50,000 in 2011, (2) to whom Defendant Companies made Liquidation Sales, (3) to whom Defendant Companies made Violation Sales, and (4) to whom ADS made 2012 sales. These customers represent over 95% of Quality Culvert's 2011 revenues. (Smith Report 18.)

Smith identified and excluded from her analysis five categories of customers whose decrease in sales could be attributed to factors unrelated to Defendant Companies' alleged violations: those whose revenues are coming through a distributor, "one time project" customers who would not regularly purchase HDPE pipe, multiple-branch customers to which ADS was

selling only at the local branch, a buying group with individual customers who are not easily ascertainable, and customers who have specific differences such as changed buying patterns. (Smith Report 17–22.)

Because discount purchases during the Inventory Liquidation Period may have impacted a customer's need for ADS products in the After Period, Smith added sales made during the Inventory Liquidation Period, converted to full price, to ADS' actual sales during the After Period. (Smith Report 22–23.) Smith excluded from her calculations any customers whose sales did not decrease from the Before Period to the After Period, considering the above adjustment. (*Id.* at 22.)

After excluding customers based on the above analysis, Smith added back two customers: Southwest Sales, Inc. and West Feed & Farm. Although their sales were apparently consistent between the Before and After Periods, "based on additional information acquired from the ADS sales force, [Smith] . . . determined that these customer's (sic) after sales were impacted," and they "are purchasing from competitors of ADS." (Smith Report 23.) She also excluded several more customers as directed by ADS, for various reasons including customer purchasing patterns. (*Id.* at 23–24.)

Smith concluded:

> [T]here are certain former HDPE customers of Defendants that ADS asserts were lost to competitors, permanently or temporarily, as a result of Defendants' actions. Based on my analysis of the market, the individual customers, ADS's overall performance, and the identified differences, I am not aware of any reason for the impact on these particular customers, other than the actions of Defendants, including, (1) making [Violation Sales] . . ., (2) providing sales related services to HDPE customers after the [Inventory] Liquidation Period, and (3) failing to dispose of inventory that was required to be liquidated . . .

(Smith Report 24–25.)

Smith categorized each of these customers as either temporarily or permanently damaged. Temporarily damaged customers are those who have returned or are returning to ADS, but for whom there was a time period of lost sales due to Defendant Companies' alleged actions. Permanently damaged customers are those ADS believes to be totally lost due to Defendant Companies' alleged actions. (Smith Report 25.) After "review[ing] additional information or [speaking] with ADS management," Smith classified four customers as temporarily damaged (Allen's Culverts, Hill Country Culverts, Inc., Precast Depot Inc., and West Feed & Farm) and four customers as permanently damaged (County Materials, Dial, Inc., Harvey Culvert, and Southwest). (*Id.* at 26–27.)

### a. Lost Profits from Temporarily Damaged Customers

Smith measured damages for temporarily damaged customers by calculating ADS' lost profits until those customers' sales figures returned to the level of the Before Period. (Smith Report 25.) She used ADS' "expected retention rate of ▮▮▮" to "determine[] the estimated after sales as equal to ▮▮▮ of the 2011 sales," and "then converted that into a monthly amount . . . to determine what the 16 months sales should have been for the period ended June 30, 2013."

Regarding Smith's adoption of ADS' expected retention rate of ▮▮▮, she notes in her report that "ADS estimated that it could retain ▮▮▮ of Quality's HDPE revenues without any additional sales people or other fixed expenses." (Smith Report 11.) She explains that "[t]his percentage is actually lower than the percentage of retained revenues in other ADS transactions. [Smith] analyzed pre- and post-transaction revenues by customer for three recent ADS acquisitions" and found the ADS retained revenues of over ▮▮▮. (*Id.* at 11, n.42.)

Smith then calculated the difference between the hypothetical ("should have been") sales and ADS' actual sales. She reduced that difference by Inventory Liquidation Period sales and Violation Sales because those sales would have decreased the customers' spending with ADS.

(Smith Report 27.) This calculation led to lost sales of ███████, to which Smith applied a gross

profit margin of ██████ to calculate lost profits of $███████. Smith states that "[t]he gross margin

percentage . . . is the incremental gross margin not including fixed cost allocations as the revenue

from the Quality Culvert acquisition was to be incremental. In other words, there were no

additional fixed costs that ADS would have to bear as a result of the QC acquisition." (*Id.* at 28

n.79 (citation omitted).)

### b. Diminution of Value from Permanently Damaged Customers

To measure damages for permanently damaged customers, Smith "calculated the

diminution in value by comparing those customers['] before revenue stream to their after

revenue stream and utilizing the valuation formula implicit in the [APA] transaction." (Smith

Report 25.)

Smith explained that, "[a]s part of the purchase, the parties negotiated and agreed to a

purchase price allocation which set forth the values for the assets being purchased." (Smith

Report 28.) Additionally, "ADS . . . analyzed the total purchase price in terms of its anticipated

return," setting forth the anticipated revenues and EBITDA. (*Id.* at 29.) Smith explains:

> The value of the customer relations is dependent on the projected
> sales associated with that group of customers, the EBITDA margin
> applicable to the asset, and the required rate of return. And in fact,
> that is the analysis that is reflected in ADS's schedule from the
> "Purchase Proposal for Plastic Pipe Assets of Quality Culvert, Inc.
> and County Pipe Corp."
>
> . . . [T]o determine . . . the diminution in value as a result of the
> damaged customer relations, the revenue and related EBITDA
> stream must be adjusted and the appropriate multiple applied.

(*Id.* at 30.)

Smith first calculated the "revenues that were projected to be retained from the identified

permanently damage[d] customers . . . by multiplying the retention rate of ████ to the 2011

revenues," reaching a revenue figure of $███████. (Smith Report 30.) She then concludes that "[t]he permanent loss (diminution of value) for permanently damaged customers is $███ million as shown below," and provides a table that shows the following. The revenue figure (rounded to ███████) is reduced by "Total Cost" of $███████ and "Other Costs" of ███████ for an EBITDA of ███████. That number is multiplied by "EBITDA Mult[iple] w/Synergies" of ███, taken from ADS' pre-transaction analysis, to reach a total diminution of value figure of ███████.

### B.    **Standard**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). This basic gatekeeping obligation applies to all expert testimony. *Kumho Tire Co.*, 526 U.S. at 147.

The requirement that expert testimony be relevant and reliable "'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in

issue.'" *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014) (citations omitted). "In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Id.* (citations omitted). "The [Rule 702] inquiry is a flexible one ... [and its focus] must be solely on principles and methodology, not on the conclusions that they generate." *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526 (6th Cir. 2014) (citing *Daubert*, 509 U.S. at 595).

 *Daubert* provides a non-exclusive, flexible checklist of factors to consider when evaluating reliability, including the following: "whether [the theory or technique] can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; "in the case of a particular scientific technique, . . . the known or potential rate of error"; and the degree of acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[T]he *Daubert* factors do not constitute a 'definitive checklist or test,'" "may be tailored to the facts of a particular case," "'are not dispositive in every case,'" and "should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (citations omitted).

 C. **Analysis**

  1. ***Expert Qualification***

 Defendants first argue that Smith is not qualified as an expert under Rule 702, which requires that an expert witness be "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Regarding this requirement, Defendants argue only that Smith has no expertise specifically regarding the market for HDPE products. However, a damages expert need not have that type of industry-specific training. *Regal Cinemas, Inc. v. W & M Properties*,

90 F. App'x 824, 833 (6th Cir. 2004). As ADS points out, Defendants' cited case does not hold otherwise. In that case, the damages experts were allowed to testify at a bench trial, and their lack of expertise in the specific industry affected the weight and credibility of their arguments, not the admissibility of their testimony. *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1068 (S.D.N.Y. 1996) aff'd, 108 F.3d 1369 (2d Cir. 1997). *See also Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04CIV.7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) ("It is not important that [the expert] does not have specific training in the field of optometry or experience related to the eye care profession because his opinions involve financial rather than industry specific analysis.").

The Court finds that Smith is qualified as an expert under Rule 702 to provide analysis regarding ADS' damages.[2]

### 2. *Reliability of Opinions on Lost Profits from Violation Sales*

Defendants assert that Smith's opinions regarding lost profits due to Violation Sales are not reliable. They argue that she failed to consider alternative explanations for ADS' alleged lost sales; the Contech Sale should not be included in the Violation Sales; the lost profits calculations lack foundation because they use ADS' gross margin and do not account for additional variable costs; and the calculations are basic math and not appropriate for expert analysis.

Smith's analysis of ADS' damages from Violations Sales is described above. Stated simply, however, this entire analysis consisted of:

      i.    An assumption, based on the allegations in the complaint, that all alleged sales recorded after the Inventory Liquidation Period are "Violation Sales";

---

[2] The Court finds that Smith is qualified to provide expert damages analysis. However, as explained below, because Smith lacks industry-specific expertise, her analysis of "comparable" products is not helpful in the absence of any independent expert analysis on the issue of damages from Violation Sales.

      ii.    An assumption, based on ADS' position, that if Defendant Companies had not made each Violation Sale, ADS would have made a corresponding sale of comparable ADS products;

      iii.    Smith's independent comparison of product descriptions to determine ADS products comparable to the products sold in Violation Sales;

      iv.    ADS product prices obtained from the ADS accounting system;

      v.    The related incremental gross margin obtained from the ADS accounting system;

      vi.    The application of addition and multiplication to the above figures.

(*See* Smith Report 8–10.)

ADS asserts that "Smith conducted her own independent analysis of ADS's lost profits, and in those instances where she used information or assumptions provided by ADS, she verified that the information was accurate and the assumptions were reasonable." (Doc. 81 at 19.) Specifically, ADS argues that Smith's assumption that ADS would have made corresponding sales was based on her analysis of the circumstances. Following the filing of the motion to exclude her testimony, Smith stated in an affidavit:

> A number of factors make it reasonable to assume that a Violation Sale caused a lost ADS sales on a one to one basis. First, the APA provided only a limited window of time for QC to sell its remaining inventory. Second, QC was supposed to assist ADS in transitioning its former customers to ADS. Third, the Violation Sales appear to be clear breaches of both of these provisions. An expert is allowed to make assumptions so long as they are reasonable.

(Smith Affidavit ¶ 9, doc. 79-11 at 4.) The Court finds that the above statement fails to explain any "factors [that] make it reasonable to assume that a Violation Sale caused a lost ADS sales on a one to one basis." Rather than providing any analysis, the statement merely states facts regarding the provisions of the APA and a legal conclusion that the Violation Sales were in breach of the APA. Importantly, the Smith Report contains no such factors or analysis, but

12

merely relies on a statement that "ADS maintains that . . . ADS would have made the Violation Sales." (Smith Report at 9.) The Smith Report makes it clear that Smith simply adopted, without analysis, ADS' position on this position. *See Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012) (expert testimony is inadmissible if based on "unrealistic assumptions" or "unsupported speculation") (citations omitted).

ADS also argues that "the 'basic math' that Defendants challenge is merely the last step in Ms. Smith's opinion," pointing to, among other things, her assessment of the potential impact of other factors on sales. (Doc. 81 at 19.) This argument does not apply to Smith's Violation Sales analysis, however, which is fairly straightforward and lacks analysis of any factors that could affect sales. Expert testimony is not necessary to assist jurors with basic arithmetic. *United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) ("Testimony of an accounting expert was excluded when it became evident that he would do no more than make basic arithmetical computations with figures supplied to him by counsel. It is a proper exercise of discretion for a court to exclude expert testimony concerning matters clearly within the realm of jurors' comprehension.") (citing *United States v. Alker*, 260 F.2d 135, 155 (3rd Cir. 1958)); *see also United States v. Madison*, 226 F. App'x 535, 544 (6th Cir. 2007) (finding that a lay witness's "conclusion . . . is a matter of arithmetic 'within the capacity of any reasonable lay person'") (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701.")); *In re Meridia Products Liab. Litig.*, 328 F. Supp. 2d 791, 808 (N.D. Ohio 2004), *aff'd sub nom. Meridia Products Liab. Litig. v. Abbott Labs.*, 447 F.3d 861 (6th Cir. 2006) ("If a witness performs 'simple arithmetic' and avoids analyzing the data, the witness does not need to qualify as an expert").

The Court finds that, aside from performing basic math, the only independent analysis Smith performed regarding Violation Sales was her comparison of product descriptions to determine comparable ADS products. However, because Smith lacks industry-specific expertise, the Court finds that her analysis of comparable products is not helpful outside the context of an independent damages analysis.

Because Smith's analysis of ADS' lost profits resulting from Violation Sales contains no independent analysis for which Smith is specifically qualified, the Court finds that it is not "based on sufficient facts or data" and would not "help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702. Defendants' motion to exclude (doc. 67) is therefore **GRANTED IN PART** as to Smith's analysis of ADS' lost profits resulting from Violation Sales.

### 3. *Reliability of Opinions on Lost Profits from Damaged Customers*

Defendants assert that Smith's opinions regarding lost profits from damaged customers are not reliable. They argue[3] that (1) Smith's opinions are not based on reliable facts and data, but rather merely "parrot" ADS' positions, and (2) she "failed to consider numerous factors that could explain why ADS did not achieve its hoped-for profits." (Doc. 68 at 11.)

### a. *Based on Reliable Facts and Data*

Aside from a conclusory argument that Smith unreasonably relied on information from ADS as to temporarily damaged customers, Defendants challenge (or apparently challenge) several specific sources of information.

First, Defendants appear to challenge Smith's adoption of ADS' identification of temporarily or permanently damaged customers. This ignores Smith's independent analysis,

---

[3] Defendants also state, apparently in the alternative, that Smith is unqualified to evaluate damages. (Doc. 68 at 11.) As stated above, the Court finds that Smith is qualified to present expert testimony on damages, and Defendants make no specific arguments to the contrary.

described in her report, in which she independently identified damaged customers based on sales information, market factors, and other information; and then revised her findings based on clarifying information from ADS regarding the current status of certain customer relationships.

Defendants also argue that Smith "simply adopted ADS' pre-APA revenue forecast" for temporarily damaged customers. This is inaccurate; Smith adopted the ███ revenue forecast after analyzing other ADS acquisitions and finding that ADS generally retained revenues over ███. (Smith Report 11, n.42.)

Defendants also challenge Smith's adoption of the gross margin obtained from ADS, ADS' position that it would not have any additional incremental costs if it had made additional sales, and ADS' anticipated earnings figures set forth in its purchase proposal. (Doc. 68 at 9–10, 12–13.) To the extent that Smith has relied on financial information supplied by ADS as a source for her independent damages analysis, the Court finds that such reliance is subject to cross examination and goes to the weight of the testimony, not its admissibility. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility'") (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

### b. Failure to Consider Alternative Explanations or Factors

Defendants argue that Smith failed to consider alternative explanations or factors leading to ADS' lost sales. Smith confirmed at her deposition that factors such as price, relationships, and product quality influence customers' purchasing decisions (Smith Dep.[4] 110, 116–17, 118, 125, 145), and Defendants argue that those factors and others, including competition from other HDPE suppliers, may have influenced ADS' alleged lost sales. For example, Defendants argue

---

[4] The Smith Deposition was filed under seal as Exhibit I to the Schmidt Declaration (doc. 69).

that, in calculating damages based on missed sales to County Materials, Smith did not consider several factors including, among others, price, relationship issues, and County Materials' business decision to exit the plastic pipe business. (Doc. 68 at 13–14.)

Defendants repeatedly imply that Smith should have contacted the damaged customers to ask why they temporarily or permanently reduced or discontinued their purchases from ADS. (Doc. 68 at 14–17.) Defendants do not acknowledge that ADS may have business reasons to prevent their expert witness from quizzing their customers (or potential future customers).

The Court finds that Smith considered many alternative factors that could have impacted ADS' sale, including market forces and customer-specific issues, as discussed above in the Court's summary of the Smith Report. The Court agrees with ADS that, "[t]o the extent Defendants claim that Ms. Smith should have considered additional factors or should have reached different conclusions based on those other factors, that argument is not a basis for excluding her opinion," but "merely go[es] to the weight of [her] testimony." (Doc. 81 at 15.) "In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury. The fact that several possible causes might remain unelimininated . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)) (internal citation and quotation marks omitted).

Defendants cite several Sixth Circuit cases for the proposition that an expert must sufficiently "rule in" or "rule out" key factors (doc. 101 at 2–3); however, those cases relate to the admissibility of a doctor's opinion using differential diagnosis to determine a medical causation, and do not apply to this case. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th

16

Cir. 2010) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (adopting a differential-diagnosis test for medical-causation expert opinions); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 680 (6th Cir. 2011); *Thomas v. Novartis Pharm. Corp.*, 443 F. App'x 58, 62 (6th Cir. 2011).

*c. Conclusion*

Defendants point out many limitations of Smith's testimony. She relies in part on financial information provided by ADS, and she apparently fails to consider several factors that could affect damages. However, the Court finds that, in general, she properly applied the Before and After method to determine damages. As stated above in the Court's summary of her report, she independently analyzed revenue changes between the Before and After Periods; she analyzed market, ADS-specific, and customer-specific factors; and she identified damaged customers by ruling out several factors that could contribute to sales losses. To the extent that Defendants assert that her sources are unreliable or that she has not considered certain factors, such arguments will go to the weight of her testimony, which will be subject to cross examination. Defendants' motion to exclude (doc. 67) is therefore **DENIED IN PART** as to Smith's analysis of lost profits and diminution in value from damaged customer relationships.

## III.   Motion to Exclude the Affidavit of Mark Sturgeon (Doc. 87)

As an exhibit to its brief opposing summary judgment, ADS filed the July 11, 2014 affidavit of Mark Sturgeon, ADS' Chief Financial Officer, Executive Vice President, member of senior management, and shareholder/owner. (Doc. 79-10 ("Sturgeon Affidavit").) According to ADS, the Sturgeon Affidavit quantifies the loss in value of the APA resulting from Defendants' wrongful competitive conduct. (Doc. 103 at 1.) Defendants seek to exclude the Sturgeon Affidavit on two grounds: (A) the Sturgeon Affidavit is inadmissible as lay opinion under Evidence Rule 701, and (B) ADS failed to disclose Sturgeon's opinions regarding damages.

### A.    __Admissible as Lay Opinion under Rule 701__

Defendants argue that the Sturgeon Affidavit is inadmissible as lay opinion under Evidence Rule 701 because it is not based on Sturgeon's own perception, contains legal conclusions, and requires specialized knowledge subject to the requirements of expert testimony under Evidence Rule 702.

As noted by another court, "[t]he commentary to Rule 701 envisions testimony of damages by officers of businesses," and "[c]ase law has applied and supports Rule 701's applicability to business owners or officers and their testimony as to their business's damages." *Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 963 F. Supp. 2d 722, 732–33 (E.D. Mich. 2013) (citations omitted). The Advisory Committee Notes to Rule 701 state:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed. R. Evid. 701, Advisory Committee Notes to 2000 Amendments (internal citation omitted). *See also Consol. Rail Corp.*, 963 F. Supp. 2d at 733–34; *Station Enter., Inc. v. Ganz, Inc.*, No. 07–14294, 2009 WL 3059148 (E.D. Mich. Sept. 24, 2009); *Lativafter Liquidating Trust v. Clear Channel Commc'ns, Inc.*, 345 F. App'x 46, 51 (6th Cir. 2009); *Aunt Sally's Praline Shop, Inc. v. United Fire & Cas. Co.*, 418 F. App'x 327, 331 (5th Cir. 2011); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995).

Moreover, an owner or officer with knowledge and participation in the day-to-day affairs of a business may in rely on part on documents prepared by others, "while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed. R. Evid. 701." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993).

18

Defendants do not attempt to distinguish any of the cases cited by ADS, several of which the Court cites above, and cite only one case in which a company officer's lay opinion on damages was excluded under Rule 701. In *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004), the Tenth Circuit held that a company president could not testify under Rule 701 regarding damages calculated by "rolling averages, S-curves, and compound growth rates," methods the witness admitted he had never used in his job. The court noted, however, that "[h]e could have given a straightforward opinion as to lost profits using conventional methods based on [the company's] actual operating history." *Id.* This case is distinguishable; the Court finds that Sturgeon's analysis is a "straightforward opinion as to lost profits using conventional methods based on [the company's] actual operating history."

The Court finds that Sturgeon's opinions regarding ADS' damages are based on his particularized knowledge by virtue of his position with ADS, and are therefore generally admissible under Rule 701. The Court is not ruling at this time as to specific statements within his affidavit that may be hearsay or are inadmissible legal conclusions. While Defendants provide examples of statements they assert are hearsay or legal conclusions, they do not present arguments as to each statement. The parties are free to raise objections regarding specific statements at trial.

**B.**    **Exclusion for Failure to Disclose**

Defendants also seek to exclude Sturgeon's testimony regarding damages under Rule 37(c)(1), which provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order

19

payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Defendants assert that ADS failed to disclose Sturgeon's opinions regarding damages under Rule 26(a) and (e) and in response to discovery requests. (Doc. 88 at 5–9.) ADS responds that Sturgeon's damages theory was disclosed "from the outset of the case" and is based on documents provided in discovery. (Doc. 103 at 1.)

In its Rule 26(a) Disclosures, ADS stated that "Mr. Sturgeon may have discoverable information related to the [APA]; actual and projected sales to Defendants' former plastic pipe customers; and the subject matters addressed in Mr. Sturgeon's affidavit submitted in support of ADS's Motion for Preliminary Injunction." (Doc. 102-1 at 1–2.) The referenced affidavit is dated January 24, 2013 and is hereinafter referred to as the "Sturgeon 2013 Affidavit." (Doc. 30.) In the Sturgeon 2013 Affidavit, Sturgeon makes several statements relating to damages:

> 64.     . . . The difficulty we have in calculating damages results from the intangible nature of the key value proposition in the acquisition — the unique customer relationships we sought to transition from Defendants to ADS.
>
> 65.     Defendants had represented that their 2011 sales to customers in the Plastic Pipe Business were $██ million. Based on its diligence prior to the closing and prior experience, ADS valued the acquisition on the reasonable assumption that it would be able to convert approximately ██ of the prior customer relationships. Historically, ADS has then grown the acquired sales base by offering a broader array of products than offered by the Seller.
>
> 66.     In sharp contrast here, however, ADS has not been able to capture anything like that level of sales because of Defendants' competitive activity.
>
> 67.     ADS is also sustaining losses in customer good will because of Defendants' improper competition. Based on our assessment of the harm to date, some of the customer relationships are not likely to recover. We hope others will recover. While ADS

20

can make reasonable estimates of the longevity of those harms and the resulting numbers, the harm to customer good will and relationships is inherently difficult to predict.

68.     The damage to our transition of key customer relationships appears to be very substantial. Customer relationships that are not captured in the early stages following the transaction become problematic because the narrow window of opportunity to transition from the prior relationships can be irreparably lost. We had bargained for and paid for Defendants' full cooperation in transitioning customer relationships and the attendant business goodwill, but got competition instead. The damage to the ongoing business and related business good will is very difficult to measure. . . .

(Sturgeon 2013 Affidavit ¶¶ 64–68.)

In ADS' Rule 26(a) disclosure on damages, it stated that ADS seeks (1) lost profits, (2) "damages for lost or impaired customer relations and goodwill as a result of Defendants' breach of contract," (3) "damages for the loss of value of the acquisition which was the subject of the [APA]," and (4) interest. (Doc. 102-1 at 5–6.)

In response to Defendants' First Set of Interrogatory Requests, ADS identified the same four categories of damages:

INTERROGATORY NO. 10.   Identify with specificity all damages claimed by ADS and describe in detail the basis for all such claimed damages and how each category of damages was calculated.

RESPONSE:    ADS objects to this Interrogatory on the grounds that it is premature in that ADS is in the process of determining the scope and extent of its damages and has engaged an expert to submit a damages report consistent with the Court's schedule. Subject to and without waiving these objections, ADS states that it is seeking the following categories of damages: (1) lost profits . . . ; (2) damages for lost or impaired customer relations and goodwill as a result of Defendants' breach of contract; (3) damages for the loss of value of the acquisition which was the subject of the [APA]; and (4) . . . interest.

(Doc. 102-3 at 8.)

21

Defendants point to Sturgeon's March 26, 2014 deposition testimony, in which he testified as follows:

> Q.      . . . Have you done any financial projections in the last year that involve the Quality Culvert customers?
>
> A.      Since probably August [2013]. And I would need to specifically look. Since we got into this significant legal effort here, we have not – we have not done, that I'm aware of, any further analysis.
>
> Q.      Okay. Is it fair to say that all the analysis was done up to the time that Miss Smith needed information, but you haven't done any updates of that information?
>
> A.      That would be correct.
>
> Q.      But you'd have the ability to do that?
>
> A.      We would.

 (Sturgeon Deposition, doc. 94-3 at 8–9.) Defendants conclude that, "[a]s of late March 2014, Mr. Sturgeon had not performed the analysis contained in his July 14, 2014 Affidavit." (Doc. 88 at 4.)

Defendants also argue that Sturgeon's damages testimony should have been disclosed by the expert witness disclosure deadline,[5] apparently relying on the position that Sturgeon's testimony is not admissible as lay opinion under Rule 701, and is therefore subject to the requirements of expert testimony under Rule 702. However, as discussed above, the Court finds that Sturgeon's damages testimony is admissible as lay opinion under Rule 701.

Defendants argue that the introduction of Sturgeon's damages testimony causes "significant" prejudice to them, and asserts that "ADS has unexpectedly and improperly

---

[5] Defendants state that, although they did not retain an expert witness for damages, they disclosed their damages theory (compiled by a company officer) by the expert witness disclosure deadline, giving ADS the opportunity to obtain a rebuttal report from their expert, Ms. Smith. Defendants complain that they had no such opportunity to rebut Sturgeon's damages testimony. (Doc. 88 at 4–5 (citing doc. 94).)

introduced an *entirely new theory and opinion seeking new damages*." (Doc. 110 at 7 (emphasis added).) In their separate argument that Sturgeon's testimony should be considered expert testimony, however, Defendants appear not to see Sturgeon's damages theory as "entirely new." Defendants state that "the parallels between the manner of analysis done by Mr. Sturgeon . . . and . . . Ms. Smith[] are striking." (*Id.* at 14.) They go on to say:

> The methodology in Mr. Sturgeon's 2014 Affidavit used to derive his alleged lay opinions *parallels the methodology* used by Ms. Smith to arrive at her alleged expert opinions. Ms. Smith and Mr. Sturgeon both identified customers that were allegedly lost or diminished due to Defendants' actions, used the same methods, assumptions (e.g., the . . . customer retention rate), and "multiple of earnings" figure when computing their respective damages figures and then did the applicable mathematical computation.
>
> The *nearly identical calculations* performed by Ms. Smith and Mr. Sturgeon can be seen when comparing pages 10-12 and 28-31 of Ms. Smith's report to paragraphs 29-32 and Exhibit l8 of Mr. Sturgeon's affidavit. Specifically, Ms. Smith calculates a diminution in value . . . by multiplying the EBITDA figure . . . times the EBITDA multiplier with synergies . . . . Mr. Sturgeon calculates a diminution of value of by multiplying the actually received profits . . . by the . . . EBITDA multiplier with synergies. These are *distinctions without differences* between supposed "lay" and "expert" testimony.

(Doc. 110 at 15 (emphasis added).)

ADS did not specifically indicate to Defendants that it would call Sturgeon to testify on damages, and Sturgeon arguably gave the impression that he would not be testifying as to damages calculations. However, the Court agrees with ADS that "Defendants were put on clear notice . . . that Mr. Sturgeon would be a witness with knowledge of ADS's damages." (Doc. 102 at 3.) As stated above, ADS twice disclosed several categories of damages, and it disclosed that Sturgeon may have information related to "the subject matters addressed in" the Sturgeon 2013 Affidavit. In that affidavit, Sturgeon discussed historical, projected, and actual sales, "damage to our transition of key customer relationships," and "[t]he damage to the ongoing business and

related business good will." He also stated that, "[w]hile ADS can make reasonable estimates of the longevity of those harms and the resulting numbers, the harm to customer good will and relationships is inherently difficult to predict." Although the Sturgeon 2013 Affidavit focused on the "difficulty we have in calculating damages," *it is clear that the "subject matters [it] addressed" included damages.*

Moreover, given the "striking" "parallels between the manner of analysis done by Mr. Sturgeon . . . and . . . Ms. Smith," the Court finds that Defendants exaggerate the prejudice caused by any ambiguity regarding ADS' intention to call Sturgeon to testify regarding damages. The Court finds that exclusion is not appropriate under Rule 37(c)(1). To avoid any possible prejudice, however, the Court orders that, as offered by ADS in its brief, ADS shall make Sturgeon available for a deposition limited to the statements in his July 11, 2014 affidavit.

## IV. Motion for Summary Judgment (Doc. 65)

Finally, Defendants also seek summary judgment on all claims.

### A. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, *Matsushito Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but "need not make assumptions that strain credulity," *Grecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012). Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where the record completely contradicts the movant's version of the facts so that no reasonable jury could believe it, the district court should not adopt the movant's version of the facts. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Deposition testimony "alone is sufficient to create a jury question . . . ." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 238 (6th Cir. 2010).

### B.    Analysis

Defendants' motion for summary judgment relies on two arguments regarding what damages can be recovered under the APA and Ohio law. First, Defendants argue that the APA "bars the damages sought by" ADS because it "excludes recovery of consequential damages, which include claims for lost profits." (Doc. 66 at 1, 9.) Second, they argue that "the lost profits damages alleged by [ADS] are entirely speculative" and therefore not recoverable under Ohio law. (*Id.* at 1, 11.)

### 1.    *Whether the APA Bars Recovery of Lost Profits*

ADS' breach of contract claim is governed by Ohio law. (APA at 22.) Under Ohio law, interpretation of a contract "is a matter of law for initial determination by the Court." *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 883 (S.D. Ohio 2013) (citations omitted). "[C]ontract interpretation is turned over to the fact-finder only when the relevant contact language is ambiguous, and the determination of whether a contract is ambiguous is decided as a matter of law by the Court." *Id.* at 883–84 (citations omitted). Under Ohio law, a court's construction of a contract "should attempt to harmonize all provisions of the contract, and should not dismiss any provision as inconsistent if there exists a reasonable interpretation that

gives effect to both." *Id.* at 884 (citing *Farmers' Nat'l Bank v. Delaware Ins. Co.*, 94 N.E. 834, 839 (1911)); *see also* 18 OHIO JUR. 3D CONTRACTS § 133.

The APA contains provisions regarding damages in two sections. Section 8, entitled "Remedies for Breaches of This Agreement," generally provides for indemnification in the case of a breach of contract. Section 6(d), entitled "Covenant Not to Compete," contains both the terms of the Covenant and a provision for damages in the case of a breach of the Covenant.

**Section 8.** The APA states at § 8(b)(i) that, in the event of a breach of contract by Defendants, Defendants "shall jointly and severally indemnify [ADS] from and against the entirety of any Adverse Consequences [ADS] may suffer . . . resulting from, arising out of, relating to, in the nature of, or caused by the breach." (APA § 8(b)(i).) However, it provides that Defendants' "obligations under §8(b)(i) shall be subject to the following: . . . (D) Sellers shall not have any indemnification obligation for, and Buyer waives any right to recover . . . consequential damages." (APA § 8(b)(iv)(D).)

The APA further provides at § 8(f) that:

> The indemnification provisions of this §8 shall be the sole and exclusive remedy with respect to any and all claims . . . [under the APA] (except to the extent otherwise expressly set forth herein) . . . In addition to the foregoing, the amount of indemnification obligations of Sellers set forth in this §8 shall be the maximum amount of Sellers' indemnification obligations hereunder . . .

"Adverse Consequences" include, among other things, "losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses." (APA § 1.)

**Section 6(d).** The APA states at § 6(d):

> [I]n the event of a breach . . . by [Defendant Companies] of any of the provisions of this §6(d) [titled "Covenant Not To Compete"], then, in addition to any other rights and remedies which [ADS] may have, [ADS] shall have the right to (i) require an accounting and repayment of all profits or other benefits directly or indirectly realized or which may be realized as a direct and proximate result

of any such breach, (ii) collect any damages caused by such breach in addition to those specifically listed herein and/or (iii) enforce any legal or equitable remedy . . .

Citing § 8(b)(iv), Defendants argue that the APA "excludes recovery of consequential damages, which include claims for lost profits." (Mot. 9.)

ADS responds that § 6(d)(ii) allows recovery of "any damages" in the case of a breach of the Covenant, and points to that part of § 8(f) which states that "[t]he indemnification provisions of this §8 shall be the sole and exclusive remedy . . . (*except to the extent otherwise expressly set forth herein*)." (APA § 8(f) (emphasis added).)

Defendants reply that, "[b]y claiming that subsection 6(d)(ii) permits ADS to seek any and all damages, including lost profits barred under § 8 of the APA, ADS is rendering the limitations of § 8 and the other language in that provision a nullity." (Doc. 95 at 3.) Defendants also argue that "the language in Subsection 6(d) should be reasonably construed to be limited to claims by ADS for equitable relief arising out of alleged breaches of the non-competition provisions of the APA," pointing to that subsection's provision of equitable relief including disgorgement of profits. (Doc. 95 at 4–5.)

While Defendants contend that ADS' interpretation of the APA renders certain provisions a nullity, the Court disagrees and finds that, instead, Defendants' interpretation renders certain provisions a nullity. The Court finds that ADS puts forth a reasonable interpretation that harmonizes all provisions of the contract. While § 8 provides for damages and indemnification in the event of a breach in general, it specifically states that it applies only "except to the extent otherwise expressly set forth herein." (APA § 8(f).) In the specific case of a breach of the Covenant, § 6(d) allows recovery of damages specifically including equitable relief, disgorgement of profits, and "any damages caused by such breach in addition to those specifically listed herein." (APA § 6(d).)

27

The Court finds as a matter of law that, in the case of a breach of the Covenant, the unambiguous language of the APA allows recovery of "any damages," including lost profits, as provided in § 6(d).

### 2.    *Evidence of Lost Profits*

Defendants also argue that "the lost profits damages alleged by [ADS] are entirely speculative" and therefore not recoverable under Ohio law. (Doc. 66 at 1, 11.) To the extent that Defendants rely on their arguments regarding inadmissibility of the testimony of Rebekah Smith and Mark Sturgeon, those arguments are rejected, as explained above.

Defendants also assert that "there is no evidence that ADS' claimed lost profits are the probable result of the Defendants' alleged breach of the APA," and that "the record indicates factors *other* than [Defendants'] alleged breach of the APA explain why ADS did not achieve its hoped-for sales goals." (Doc. 66 at 11, 12.) Specifically, Defendants argue that the record creates no genuine question of material fact as to whether the eight identified "damaged" customers would have purchased from ADS in the absence of the alleged breach. Defendants point out that "ADS has not come forward with testimony from any customers, the very people who could explain their purchasing decisions." (Doc. 95 at 12.)

Specifically regarding County Materials, Defendants assert that it was not contractually obligated to buy from ADS, ADS did not offer at-cost pricing to County Materials as Quality Culvert had, County Materials made a business decision to exit the plastic pipe business to focus on concrete pipe, and ADS damaged its relationship with County Materials when ADS sued Defendants, which were County Materials' related entities.

ADS responds that significant evidence shows that ADS' lost profits are the probable result of Defendants' breach, and the evidence is sufficient to establish the existence and amount of lost profits with reasonable certainty. (Doc. 79 at 11–28.)

While some of Defendants' evidence may constitute hearsay, the Court need not determine the admissibility of each item at this time, because the Court finds that, taken as a whole, Defendants' evidence does not establish that the customers' purchasing decisions were unaffected by the alleged breach.[6] Rather, the Court finds that the evidence of several possible causes of the "damaged" customers' purchasing decisions supports a finding that there is a genuine question of material fact as to the effect of Defendants' alleged breach.

The Court finds a genuine question of material fact regarding the effect of the alleged breach on ADS' sales and profits, and finds that ADS has presented sufficient evidence to establish the existence and amount of lost profits with reasonable certainty. The Court therefore **DENIES** Defendants' motion for summary judgment.

## V.  Conclusion

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Exclude The Expert Witness Testimony of Rebekah Smith (doc. 67), **DENIES** Defendants' Motion *In Limine* to Exclude July 14, 2014 Affidavit of Mark Sturgeon (doc. 87), and **DENIES** Defendants' Motion for Summary Judgment (doc. 65). The Court also **GRANTS** Plaintiff's motion for leave to file a surreply (doc. 104).

**IT IS SO ORDERED.**

**UNITED STATES DISTRICT JUDGE**

---

[6] Because this allegation could have significant importance, the Court notes that Defendants have presented no evidence conclusively establishing that County Materials intended to immediately exit the plastic pipe business without regard to the allegations in this case.